UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DEVONTE L. LITTLE,                    )
                                      )
        Little,                       )
                                      )
        vs.                           )          Case No. 4:19-cv-01391 SRC
                                      )
CORIZON, et al.,                      )
                                      )
        Defendants.                   )

**Memorandum and Order**

Despite receiving treatment from Saint Louis City Justice Center's medical staff for complaints of headaches and vision loss, inmate Devonte Little was diagnosed with medical conditions related to those complaints by physicians outside the Justice Center. The inmate filed a Section 1983 action against the Justice Center's medical staff, alleging that the failure to provide him the medical care he required amounted to deliberate indifference to his serious medical needs. Defendants filed a motion for summary judgment, which the court grants.

**I.      Background**

Devonte Little, a pretrial detainee currently incarcerated at the Saint Louis City Justice Center, filed a 42 U.S.C. § 1983 action against Corizon Health, Dr. Unknown Fuentes and Nurse Unknown Knox.[1]  Doc. 1. He alleges that Defendants were deliberately indifference to his serious medical needs. He sued Dr. Fuentes in both her official and individual capacities, but only sued Knox in her individual capacity. Doc. 1. The Court dismissed the claim against Corizon and the official capacity claim against Dr. Fuentes. Doc. 12.

---

[1] The "unknown" Defendants subsequently identified themselves as Dr. Fe Fuentes and Sherry Knox.  Doc. 16.

Dr. Fuentes and Knox filed a motion for summary judgment.  Doc. 33.  After Little failed to timely respond to Defendants' motion for summary judgment, the Court ordered Little to show cause why the motion should not be granted.  Doc. 37.  Little filed a letter to the Court that included narrative statements explaining how Defendants were deliberately indifferent to his serious medical needs and identified the evidence supporting his position.  Doc. 38.  However, Little failed to present the stated evidence to the Court.  Defendants then filed a reply to the motion for summary judgment.  Doc. 40.

After the motion had been fully briefed, Little filed a motion to appoint counsel.  Doc. 41.  The Court then issued an order instructing Little how to present his evidence and respond to Defendants' Statement of Uncontroverted Material Facts in compliance with Local Rule 4.01(E).  Doc. 42.  Little has not responded to that order.

## II.    Uncontroverted material facts

Defendants, in accordance with the Court's Local Rules, submitted a Statement of Uncontroverted Material Facts.  Little initially failed to respond to Defendants' motion or Statement of Uncontroverted Material Facts.  The Court issued a show cause order requiring Little to show cause why the Court should not grant Defendants' motion.  Little filed a letter to the Court but did not respond to Defendants' facts in accordance with the Federal Rules of Civil Procedure and the Court's Local Rules.  He further failed to respond to the Court's order instructing him how to comply with Local Rule 4.01(E).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides the procedures for supporting factual positions:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

2

declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Relatedly, Rule 4.01(E) of this Court's Local Rules provides:

(E) Every memorandum in support of a motion for summary judgment must be accompanied by a document titled Statement of Uncontroverted Material Facts . . . Every memorandum in opposition must be accompanied by a document titled Response to Statement of Material Facts…. The Response must set forth each relevant fact as to which the party contends a genuine issue exists. The facts in dispute shall be set forth with specific citation(s) to the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from the moving party's Statement of Uncontroverted Material Facts. *All matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party*.

E.D. Mo. L.R. 4.01(E) (emphasis added).

Little failed to follow these rules.  Pro se litigants are not excused from complying with substantive and procedural law, including the Court's Local Rules.  *Farnsworth v. City of Kansas City, Mo.*, 863 F.2d 33, 34 (8th Cir. 1988); *Bunch v. Univ. of Ark. Bd. of Trustees*, 863 F.3d 1062, 1067 (8th Cir. 2017).  Although Little failed to properly respond to Defendants' statement of material facts, the Court does not automatically grant summary judgment for Defendants.  Instead, the Court deems the facts set forth by Defendants' admitted pursuant to Local Rule 4.01(E).  *Reasonover v. St. Louis Cty*., *Mo*., 447 F.3d 569, 579 (8th Cir. 2006).  Defendants must still establish that they are entitled to judgment as a matter of law.  *Id.*  Accordingly, the undisputed facts, as set forth in Defendants' statement of facts, are:

Little was a pretrial detainee incarcerated at the Saint Louis City Justice Center.  Doc. 34 at ¶ 1. On March 10, 2017, Little saw registered nurse Ashley Jacox as a new arrival to the

Justice Center. *Id*. at ¶ 2.  He reported headaches from a gunshot wound to his head in December 2016.  *Id*.

Dr. Fuentes saw Little for the first time on October 18.  *Id*. at ¶ 3.  Little had no history of seizures and Dr. Fuentes found him neurologically intact.  *Id*.  Dr. Fuentes assessed that Little had a headache and prescribed Naproxen for pain relief for 30 days.  *Id*.

Dr. Fuentes saw Little again on December 22.  *Id*. at ¶ 4.  She examined his eyes and noted that his pupils were 3 mm, which is normal.  *Id*.  She observed no afferent pupillary defect, which occurs when the pupils respond differently to light stimuli shone in one eye at a time due to unilateral or asymmetrical disease of the retina or optic nerve.  *Id*.  Dr. Fuentes found Little neurologically intact.  *Id*.  She ordered Naproxen for his headaches and later ordered acetaminophen on January 7, 2018 for Little's headaches.  *Id*.

Dr. Fuentes next saw Little on January 11 after a suspected allergic reaction.  *Id.* at ¶ 5. She admitted Little into the infirmary for observation.  *Id*.  Little denied having taken a psychotropic medication or any drugs.  *Id*.  He had taken Naproxen and acetaminophen in the past and did not develop any allergic reaction.  *Id*.  Dr. Fuentes assumed Little consumed food he was allergic to, but she still stopped the Naproxen and left acetaminophen for his headaches and prescribed prednisone tabs for his allergies.  *Id*.

The next day, Little saw licensed practical nurse Lelia Beathea, who asked him how he felt.  *Id*. at ¶ 6.  Little attempted to verbalize a response, but his speech was unintelligible.  *Id*. Dr. Fuentes then saw Little and noted he had no complaints but still had staggering gait.  *Id*. Little denied having ingested a drug.  *Id*.  Dr. Fuentes noted his history of a gunshot wound to the head in December 2016 for which he received treatment at St. Louis University Hospital.  *Id*. During her assessment of Little, Dr. Fuentes concluded that Little had asymmetry of face, loss of

4

wrinkles on the right side, and unsteady gait. *Id*. Dr. Fuentes again observed no afferent pupillary defect. *Id*. She also ordered labs to be drawn. *Id*. Unsure of what caused the abnormalities, Dr. Fuentes sent Little to St. Louis University Hospital, where he was diagnosed with peritonsillar abscess and prescribed Clindamycin and Tramadol. *Id*.

On January 16, Dr. Fuentes saw Little for a follow up after his return from Saint Louis University Hospital with a diagnosis of peritonsillar abscess. *Id*. at ¶ 7. She noted that a CT scan of the head was negative. *Id*. Upon examination, Dr. Fuentes found that Little's tonsils were injected +1, with no visible abscess, he had a tachycardic heartbeat, he had clear breath sounds, and had steady but slow gait. *Id*. The swelling of Little's throat made his speech unclear. *Id*. Dr. Fuentes assessed a peritonsillar abscess and educated Little about his medication. *Id*.

On February 23, Little saw licensed practical nurse Lelia Beathea for complaints of headaches. *Id*. at ¶ 8. Dr. Fuentes provided an oral order for a prescription of acetaminophen for the headaches. *Id*. On March 12, Little saw licensed practical nurse Raecheal Handson for complaints of ongoing headaches. *Id*. at ¶ 9. Handson noted that Little was not in acute distress. Dr. Fuentes provided an oral order for ibuprofen. *Id*. On April 10, she prescribed ibuprofen for headaches until April 16. *Id*.

On June 6, Dr. Fuentes saw Little for complaints of recurrent headaches for one year and upper chest pains that he began to experience the day before. *Id*. at ¶ 10. She found that Little's pupils were 3 mm with no afferent pupillary defect and that he was neurologically intact. *Id*. Dr. Fuentes assessed that Little suffered from functional dyspepsia (indigestion) and a headache. *Id*. She prescribed ibuprofen for his headaches and omeprazole for probable dyspepsia. *Id*.

On July 7, Dr. Fuentes prescribed acetaminophen until July 13 and on July 19, she prescribed it until August 1. *Id*. at ¶ 11. On August 3, Dr. Fuentes saw Little for recurrent headaches. *Id*. He reported the headaches were located just above his right eye and the back of his head. *Id*. Dr. Fuentes noted the history of a gunshot wound to his head. *Id*. On examination, Little's pupils were 3 mm with no afferent pupillary defect, and he was neurologically intact. *Id*. Dr. Fuentes prescribed Mobic for headaches until August 16. *Id*. On August 21, she gave an oral order for ibuprofen until August 24. *Id*. at ¶ 12.

On August 24, a Code 3 was called for Little's complaints of a headache and shortness of breath. *Id*. at ¶ 13. Little was evaluated by registered nurse Crystal Bailey, registered nurse Florine Scott, and licensed practical nurse Sherry Knox. *Id*. Bailey noted that Little had run down the steps, but his oxygen saturation was 98 percent and air was heard moving through the lungs. *Id*. Little was not having trouble breathing and an even and symmetrical chest rise. *Id*. Scott documented that Little came running down the stairs to be assessed, his vital signs were stable, his skin was warm and dry, and there were no signs of respiratory distress. *Id*. Knox similarly found that there were no signs or symptoms of distress. *Id*. She noted that Little continued to talk during the assessment, and he was escorted back to his cell. *Id*. Knox also scheduled a follow-up appointment with a doctor. *Id*.

Knox assessed Little in the hallway because there was another emergency in the medical unit at that time. *Id*. at ¶ 14. Knox took and documented Little's vital signs and gave them to the charge nurse who was present. *Id*. Knox assessed Little's vital signs and respirations and found no sign of distress. *Id*. at ¶ 15. Little's pulse was elevated at 125 beats per minute, but she did not find such a rate unusual because he had run down the steps and ran

6

through the unit.  *Id*.  Little continued to talk during the assessment and was escorted back to his cell.  *Id*.

Nothing about Little's presentation on August 24 indicated to Knox that he had any sort of medical emergency.  *Id*. at ¶ 16.  He could open both eyes completely, not short of breath, and talked throughout the exam.  *Id*.  She did not provide any pain medication during this visit because she knew that he had recently seen Dr. Fuentes for headaches and had been prescribed ibuprofen on August 21.  *Id*.

She observed his objective presentation and took his vital signs.  *Id*. at ¶ 17.  In her nursing judgment, there was no medical emergency or need for any further treatment at that time. *Id*.  Upon review of the nurses' medical records, Dr. Fuentes likewise concluded that Little did not have a medical emergency.  *Id*. at ¶ 18.  In addition, the nurses scheduled him for a follow up with a provider, which was appropriate.  *Id*. at ¶¶ 15, 17, 18.

On August 25, Dr. Fuentes prescribed ibuprofen until August 27.  *Id*. at ¶ 19.  On August 27, 2018, Dr. Fuentes saw Little again for complaints of a headache for three days associated with blurry vision.  *Id*.  Little reported no weakness or vomiting, and he was neurologically intact with a good steady gait.  *Id*.  Little's visual acuity was 20/50 OD (right eye) and 20/50 OS (left eye).  *Id*.  Dr. Fuentes assessed a headache and prescribed Naproxen.  *Id*.

In Dr. Fuentes's experience, headaches are extremely common with inmates at the Justice Center.  *Id*. at ¶ 20.  As inmates transition into the jail environment, they are under a lot of stress because of their legal issues and new surroundings.  *Id*.  Accordingly, headaches are a frequent complaint among many inmates.  *Id*.  In addition, many inmates have uncorrected vision that also causes headaches.  *Id*.  Dr. Fuentes recalls explaining to Little that his headaches were likely due to stress or his vision.  *Id*.  At the visit on August 27, 2018, Little's vision was the same in both

7

eyes and he was neurologically intact.  *Id*.  Dr. Fuentes believed Little's headaches were caused by his vision.  *Id*.

Dr. Fuentes saw Little again the next day for complaints of headaches with no vomiting or fever.  *Id*. at ¶ 21.  Little cried during the examination.  *Id*.  His heart and lungs sounded normal.  *Id*.  Dr. Fuentes placed him in the infirmary so that Tylenol #3 could be administered every six hours.  *Id*.  She also provided a one-time dose of hydroxyzine pamoate (Vistaril) for his headaches.  *Id*.  Vistaril is often used to treat the nausea and vomiting and, to some extent, the pain associated with a migraine attack.  *Id*.

On August 29, Little was placed in the infirmary for a twenty-three-hour observation.  *Id*. at ¶ 22.  He reported his headaches were not as severe, but he still had blurry vision.  *Id*. Because his headaches were diminished, Dr. Fuentes planned to discharge him from the infirmary back to his cell.  *Id*.  She prescribed him Excedrin Migraine.  *Id*.

On September 5, Dr. Fuentes noted that, per the Health Services Administrator, Little's brother died two weeks ago and his symptoms of bad headaches started after he heard the news. *Id*. at ¶ 23.  Dr. Fuentes believed the stress of his brother's death could be causing or contributing to his headaches.  *Id*.

On September 6, Dr. Fuentes saw Little to follow up on his migraines.  *Id*. at ¶ 24.  He reported his headaches were not as severe, but his vision was still blurry, and he had occasional ringing in his ears.  *Id*.  On examination, Little was neurologically stable with normal heart and lung sounds.  *Id*.  His ears were negative, and Dr. Fuentes observed no pharyngeal injection, meaning his throat was not red.  *Id*.  She noted Little was stable, but lab work needed to be done. *Id*.  Dr. Fuentes ordered multiple lab studies and a skull x-ray.  *Id*.  Dr. Fuentes was unable to locate the radiology report from this x-ray in the medical records.  *Id*.

8

On September 13, Dr. Fuentes prescribed Excedrin for Little's headaches until September 26. *Id*. at ¶ 25. On September 25, Dr. Fuentes saw Little for complaints of dizziness for three days with no vomiting or fever. *Id*. She prescribed Naproxen for headaches until October 24. *Id*.

On September 28, Dr. Fuentes saw Little for complaints of sudden vision loss for two days and recurrent headaches for more than a year. *Id*. at ¶ 26. On examination, Little's visual acuity was OD 20/70 and OS no light perception. *Id*. His heart and lungs sounded normal. Little's pupil OS was 5-6 mm and non-reactive; the OD pupil was 3 mm and reactive. *Id*. Dr. Fuentes sent him to the emergency room for evaluation. *Id*. Based on Little's sudden loss of vision, Dr. Fuentes suspected he may have optic neuritis, which is inflammation of the optic nerve. *Id*. at ¶ 27. Optic neuritis is often accompanied by headache and sudden loss of vision, and must be treated emergently. *Id*.

Little's complete medical records from St. Louis University Hospital were not sent back to the Justice Center, and only the discharge instructions were received and reviewed. *Id*. at ¶ 28. He was prescribed various doses of prednisone for several weeks and recommended for several follow up appointments. *Id*.

On October 8, Little returned from St. Louis University Hospital. *Id*. at ¶ 29. Florine Scott reordered ibuprofen and ordered penicillin. *Id*. Dr. Fuentes ordered prednisone for the eye infection, Acetazolamide for glaucoma, and artificial tears per the order of the ophthalmologist. *Id*. Dr. Fuentes saw Little on October 9 and advised him to take all his medications. *Id*. at ¶ 30. On examination, Little's visual acuity was 20/25 OD, 10/400 OS, indicating his vision was returning in his left eye. *Id*. Dr. Fuentes admitted him into the infirmary for close monitoring of medication intake. *Id*. In addition to prednisone, she prescribed Apixaban, or Eliquis, an

anticoagulant prescribed at St. Louis University Hospital for the cerebral sinus thrombosis. *Id.* Dr. Fuentes also prescribed prednisolone 1%, a steroid used to treat inflammation, and Valganciclovir, an antiviral drug used to prevent infection prescribed by St. Louis University Hospital for his cerebral sinus thrombosis and possible viral infection. *Id.*

A cerebral sinus thrombosis occurs when a blood clot forms in the brain's venous sinuses. *Id.* at ¶ 31. This can prevent blood from draining out of the brain and blood cells may break and leak blood into the brain tissues as a result, forming a hemorrhage causing a rare form of stroke. *Id.* Symptoms of a cerebral sinus thrombosis include headache, blurred vision, fainting or loss of consciousness, loss of control over movement in part of the body, seizures, and coma. *Id.* In this case, the cause and timing of Little's cerebral sinus thrombosis are unclear. *Id.* A cerebral sinus thrombosis can be developed by anyone, and the exact cause is not known. *Id.* The specialists who have seen Little have been unable to determine the cause of his cerebral sinus thrombosis. *Id.*

On October 17, Little had a visit at the eye clinic for posterior uveitis of the left eye. *Id.* at ¶ 32. He was prescribed prednisone 60 mg and instructed to continue his other medications. *Id.* Uveitis is a form of eye inflammation that affects the middle layer of tissue in the eye wall (uvea). *Id.* at ¶ 33. Uveitis warning signs often come on suddenly and get worse quickly, including eye redness, pain, and blurred vision. *Id.* The condition can affect one or both eyes. *Id.*

Dr. Fuentes saw Little after he returned from the eye clinic. *Id.* at ¶ 34. He reported he had not had a headache since he returned from the hospital. *Id.* On examination, his visual acuity was 20/40 OD and 20/200 OS. *Id.* Dr. Fuentes prescribed prednisolone 1% for uveitis until November 15. *Id.* She also prescribed prednisone tabs until October 23 for diagnosis of

uveitis until he saw a rheumatologist.  *Id*.  On October 25, Dr. Fuentes prescribed artificial tears
to lubricate the eyes and acetaminophen for pain.  *Id*.

On November 6, Little returned from St. Louis University Hospital rheumatology with
Dr. Mara Horwitz.  *Id*. at ¶ 35.  Little reported he did not see the doctor and they were supposed
to call.  *Id*.  Dr. Fuentes prescribed artificial tears and prednisolone 1% for eye infection and
uveitis.  *Id*.  On November 9, Dr. Fuentes noted that, per the rheumatologist, Little needed to
take Azathioprine.  *Id*.  She assessed rheumatoid heart disease with rheumatoid arthritis of the
left shoulder.  *Id*.  Dr. Fuentes prescribed Azathioprine per rheumatology.  *Id*.  Azathioprine is an
immunosuppressive medication used to treat rheumatoid arthritis.  *Id*.

On November 14, Dr. Fuentes prescribed Timolol 0.25% ophthalmic solution for
glaucoma, left eye.  *Id*. at ¶ 36.  On November 16, she prescribed Azathioprine for rheumatoid
heart disease with rheumatoid arthritis of the left shoulder.  *Id*.  Dr. Fuentes re-prescribed it on
November 24.  *Id*.  On December 5, she prescribed prednisolone 1% for uveitis.  *Id*.

On December 6, Little saw rheumatologist Dr. John Richart.  *Id*. at ¶ 37.  Dr. Richart
noted Little was diagnosed with dural venous thrombosis, sigmoid and right transverse with
extension into the jugular vein in the setting of mastoiditis and Behcet's Disease.  *Id*.  He
recommended a six-month course of Apixaban and then repeating Protein S level.  *Id*.  He also
recommended that Little should take a daily aspirin after completion of Apixaban.  *Id*.
Mastoiditis is a serious infection in the mastoid process, which is the hard, prominent bone just
behind and under the ear.  *Id*. at ¶ 38.  Untreated ear infections cause most cases of mastoiditis.
*Id*.  The condition is rare but can become life-threatening without treatment.  *Id*.  Behçet's
Disease is a multisystem relapsing inflammatory disorder that is thought to be an inflammatory
perivasculitis.  *Id*.  Behçet's Disease is a rare disorder that causes blood vessel inflammation

11

throughout the body.  *Id*.  It can lead to numerous signs and symptoms that can seem unrelated at first such as mouth sores, eye inflammation, skin rashes and lesions, and genital sores.  *Id*.

On December 13, Little returned to the rheumatologist for Behçet's Disease, uveitis, high risk medications (not anticoagulants) long-term use, and therapeutic drug monitoring.  *Id*. at ¶ 39. The rheumatologist requested labs and planned to likely increase the Azathioprine to twice daily. *Id*.  He also requested a follow up in 2-3 months and repeat labs.  *Id*.  Dr. Fuentes saw Little after he returned from rheumatology.  *Id*.  She prescribed prednisolone ophthalmic 1% and artificial tears.  *Id*.

On December 21, Dr. Fuentes prescribed acetaminophen until January 3, 2019.  *Id*. at ¶ 40.  On January 14, she prescribed prednisolone acetate ophthalmic suspension for uveitis.  *Id*. On January 28, Dr. Fuentes ordered acetaminophen until February 10 for pain.  *Id*.  On February 4, she ordered Apixaban for bilateral panuveitis, acetazolamide tabs for glaucoma, Valganciclovir tabs for eye infection, and acetaminophen for pain.  *Id*.  On February 27, Dr. Fuentes renewed Azathioprine for rheumatoid heart disease with rheumatoid arthritis of left shoulder.  *Id*.  She re-prescribed it on March 1.  *Id*.

On March 5, Dr. Fuentes saw Little to follow up on uveitis and occasional headaches.  *Id*. at ¶ 41.  Little's visual acuity was OD 20/40, OS 20/80.  *Id*.  Dr. Fuentes assessed Behçet's Disease, noted that Little was stable with partial recovery of vision, and continued Pred Forte (prednisolone ophthalmic solution).  *Id*.

On April 8, Dr. Fuentes prescribed Acetazolamide, Apixaban, Timolol, and Valganciclovir for the sinus thrombosis, glaucoma, and BD.  *Id*. at ¶ 42.  On April 10, Little underwent a physical.  *Id*.  His general appearance was good with visual acuity OD 40/40 and

OS 20/200. *Id*. He complained of a headache and tooth pain. *Id*. He was referred to dental and Dr. Fuentes ordered acetaminophen for his headaches. *Id*.

On May 3, Dr. Fuentes ordered acetaminophen until May 9. *Id*. at ¶ 43. On May 9, she saw Little for his complaints of a severe headache two weeks before. *Id*. Dr. Fuentes noted his history of cerebral sinus thrombosis and Behçet's Disease plus glaucoma and his treatment by a rheumatologist with Azathioprine for Behçet's Disease. *Id*. His visual acuity was OD 20/50, OS 10/400. *Id*. Dr. Fuentes assessed recurrent oral aphthae (a canker sore) and referred him to rheumatology for a follow up. *Id*. She ordered colchicine for the canker sore as prescribed by the rheumatologist for recurrent ulcers in his mouth secondary to Azathioprine. *Id*. Little had blood work, a urinalysis, labs, and a rheumatoid panel performed. *Id*.

On May 12, Dr. Fuentes prescribed acetaminophen until May 18. *Id*. at ¶ 44. On May 15, she saw Little for complaints of a sore throat for four days. *Id*. He still had a lesion on the right side of his tongue. *Id*. Dr. Fuentes assessed acute pharyngitis and prescribed amoxicillin. *Id*. On May 24, she saw Little and he had no more lesions in his mouth. *Id*. On May 30, Dr. Fuentes prescribed Azathioprine for rheumatoid heart disease with rheumatoid arthritis of his left shoulder. *Id*.

On June 27, Dr. Fuentes ordered aspirin due to cerebral venous thrombosis, nonpyogenic. *Id*. at ¶ 45. On June 28, she saw Little after his return from Hematology/Oncology at St. Louis University Hospital. *Id*. Dr. Fuentes noted Apixaban had been discontinued and prescribed him aspirin. *Id*. Little reported occasional left-sided headache and heaviness. *Id*. His Protein S blood level was taken at the Hematology clinic and Dr. Fuentes noted she would call the office to ask when the next Protein S level would be taken. *Id*.

On July 3, Dr. Fuentes saw Little for complaints of a sore throat for three days with no fever. *Id*. at ¶ 46. His tonsils were enlarged, and Dr. Fuentes assessed acute pharyngitis and prescribed amoxicillin. *Id*. On July 7, Dr. Fuentes prescribed Acetazolamide and Valganciclovir. *Id*.

On July 12, Dr. Fuentes saw Little to follow up on his tonsillitis. *Id*. at ¶ 47. He was asymptomatic and requested eyeglasses. *Id*. Little's visual acuity was 20/50 OD, OS 20/100. *Id*. Dr. Fuentes assessed tonsillitis, acute, resolved. *Id*. She referred him to the Eye Institute for glasses. On July 16, Dr. Fuentes prescribed Valganciclovir. *Id*.

On August 10, Little saw license practical nurse Staci Ramsey for a complaint of a headache and Dr. Fuentes prescribed acetaminophen until August 16. *Id*. at ¶ 48. On August 22, Dr. Fuentes prescribed Timolol. *Id*. On August 28, Dr. Fuentes prescribed Atropine sulfate syringe and Azathioprine for Behçet's Disease. *Id*. On September 3, Little received a prescription for eyeglasses from the Eye Institute. *Id*.

On October 12, Dr. Fuentes prescribed Acetazolamide for glaucoma. *Id*. at ¶ 49. On October 15, she saw Little for complaints of blurry vision and requested renewal of some of his medications. *Id*. Little's visual acuity with glasses was OD 20/15, OS 20/20. *Id*. His pupils were 3 mm with no afferent pupillary defect. *Id*. Dr. Fuentes assessed a headache and prescribed acetaminophen, aspirin, and Valganciclovir. *Id*.

On November 20, Dr. Fuentes saw Little, who reported his left nostril was stuffy for one week. *Id*. at ¶ 50. He also stated he had been an altercation a few days ago and had redness of his left eye and eyelids where he was hit. *Id*. On examination, Dr. Fuentes noted no pharyngeal injection. *Id*. Little had redness to upper and lower eyelids of the left eye with +1 conjunctival injection. *Id*. Dr. Fuentes assessed an acute respiratory infection and ecchymosis

14

left upper and lower eyelids secondary to trauma.  *Id*.  She prescribed sodium chloride nasal spray.  *Id*.

On November 29, Dr. Fuentes prescribed Azathioprine.  *Id*. at ¶ 51.  On April 13, 2020, she renewed Little's Timolol and Valganciclovir.  *Id*.  On June 25, Dr. Fuentes saw Little for complaints of a sore throat the week before and having been prescribed amoxicillin.  *Id*.  He no longer had a sore throat.  Dr. Fuentes observed no pharyngeal injection.  *Id*.  Little's visual acuity with eyeglasses was OD 20/20, OS 20/40, and OU 20/20.  *Id*.

## III.    Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.     Discussion

### A.     Little's status as a pretrial detainee

The Eighth Amendment imposes duties on prison officials with regards to prisoners convicted of a crime. *Christian v. Wagner*, 623 F.3d 608, 612 (8th Cir. 2010) (citations omitted). But it does not apply to pretrial detainees; instead, the Due Process Clause of the Fourteenth Amendment imposes similar duties on jailers of detainees. *Id*. at 613 (citations omitted). "'[U]nder the Fourteenth Amendment, pretrial detainees are entitled to 'at least as great protection' as that afforded convicted prisoners under the Eighth Amendment.'" *Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005) (quoting *City of Revere v. Mass. Gen. Hosp*., 463 U.S. 239, 244 (1983)). Thus, while Little's claims fall under the Fourteenth Amendment, this distinction "makes little difference" in evaluating his claims. *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (stating "[t]his makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." (citations omitted)).

### B.     Deliberate indifference to Little's serious medical needs

The Eighth Amendment requires prison officials to provide inmates with medical care. *Laughlin v. Schriro*, 430 F.3d 927, 928 (8th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (internal citations and quotations omitted). Claims of medical malpractice or

16

negligence in diagnosing or treating a medical condition do not state a valid claim for inadequate medical treatment in violation of the Eighth Amendment. *Id*. at 106. "A plaintiff claiming deliberate indifference must establish objective and subjective components. The objective component requires a plaintiff to demonstrate an objectively serious medical need. The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." *Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013) (internal citations and quotations omitted). "[P]rison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment or [ ] prison doctors who fail to respond to a prisoner's serious medical needs" demonstrate deliberate indifference. *Id*. (citing *Estelle*, 429 U.S. at 104–05). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Corr. Med. Servs*., 512 F.3d 488, 499 (8th Cir. 2008) (citing *Olson v. Bloomberg*, 339 F.3d 730, 736 (8th Cir.2003)).

"Prisoners do not have a constitutional right to a particular type of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (citation omitted). "Nothing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment." *Id*. "[T]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii*, 512 F.3d at 499.

Defendants do not dispute that Little had objectively serious medical needs. Instead, they argue that they are entitled to summary judgment because they were not deliberately indifferent to Little's serious medical needs.

### 1.    Dr. Fuentes

Little contends that Dr. Fuentes was deliberately indifferent because she refused to get him outside emergency treatment for his headaches and failed to provide him with earlier medical care for the conditions earlier diagnosed by the physicians at St. Louis University Medical Center.  Little's basis for his deliberate indifference claim either runs counter to the undisputed facts or sound in medical malpractice, which cannot support a claim for deliberate indifference.

Dr. Fuentes repeatedly examined Little for his headaches.  Not only did she physically assess him, finding among other things, that he was neurologically intact and had no afferent pupillary effect, she also ordered a skull exam x-ray to determine the cause of the headache.  She proscribed him numerous medications to treat his headaches, including acetaminophen, Naproxen, ibuprofen, Mobic, Excedrin Migraine, Tylenol #3, and Vistaril.  In addition to her physical examinations, Dr. Fuentes relied on her experiences that headaches were caused by stress and poor vision, and Little's episodes of blurry vision aided her hypothesis that the headaches were caused by those two factors.

Dr. Fuentes placed Little in the infirmary and even sent Little to the hospital when he exhibited unusual symptoms.  For example, when she could not determine why Little had asymmetry of face, loss of wrinkles on the right side, and unsteady gait, she sent Little to St. Louis University Hospital.  She saw Little for a follow up after his return from the hospital with a diagnosis of peritonsillar abscess.  She noted that a CT scan of the head was negative.  After performing an examination and assessing that he had a peritonsillar abscess, she educated Little about his medication.

Dr. Fuentes also sent Little to the hospital when he experienced sudden vision loss and she suspected he may optic neuritis. She again saw Little upon his return.  She ordered him the medication prescribed by the doctors at St. Louis University Hospital and advised him to take his medication.  She also performed an examination and placed him in the infirmary for close monitoring of medicinal intake.

To the extent Little's bases his deliberate indifference claim on Dr. Fuentes's failure to diagnose his cerebral sinus thrombosis and Behcet's disease, the evidence does not support that her failure to make these diagnoses stemmed from Dr. Fuentes disregarding Little's medical needs.  As provided above, Dr. Fuentes repeatedly examined Little and treated his complaints about headaches and vision.  While Dr. Fuentes could have identified these conditions earlier or provided different care, such facts cannot establish a viable deliberate indifference claim. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997); *Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir. 1997); *Popoalii v. Correctional Medical Services*, 512 F.3d 488, at 499 (8th Cir. 2007); *Corwin v. City of Indep., MO*., 829 F.3d 695 (8th Cir. 2016).  Rather, evidence must show that Dr. Fuentes was aware of a serious risk of harm to Little and ignored that risk.  *Logan*, 119 F.3d at 649. Because no such evidence has been presented, the Court grants the motion for summary judgment as to Dr. Fuentes.

### 2.    Knox

Little's deliberate indifference claim against Knox stems from a medical emergency that occurred on August 24, 2018.  Little alleges that a medical emergency was called because he had a headache, blurry vision, and trouble breathing.  In response to the emergency, Little alleges that Knox stated the Little was just complaining and that his vitals should be taken and then sent

back to his cell.  Doc. 1. at 4.  He also argues that even though a lay person would have known that he needed emergency attention, Knox refused to call a physician.  Doc. 38 ¶ 4.

Medical records from August 24, 2018 demonstrate that a Code 3 (an emergency code) was called in response to Little's complaint.  Knox, along with nurses Crystal Bailey and Florine Scott, evaluated Little.  They noted that he was not having trouble breathing and that his chest rise was even and symmetrical.  Knox assessed Little's vital signs and respirations and found no sign of distress.  She observed that Little's pulse was elevated at 125 beats per minute, but she did not find such a rate unusual because he had run down the stairs and the unit to reach the nurses.  Medical records reflect that Little talked throughout his examination and he could completely open his eyes.  Lastly, Knox stated that she did not provide any pain medication because he knew that Little had seen Dr. Fuentes on August 21, 2018 and she prescribed him ibuprofen.

Based on her assessment, Knox concluded that Little's condition did not indicate that he was having a medical emergency.  The other two nurses assessing Little reached the same conclusion.  Nevertheless, Knox still scheduled a follow-up appointment with a doctor. Following a review of the medical records, Dr. Fuentes agreed that Little did not have a medical emergency.

The undisputed evidence in the case establishes that Knox was not deliberately indifferent to Little's medical needs.  She responded to Little's Code 3 by checking his vitals and assessing his condition, after which she concluded he did not suffer from a medical emergency. She also scheduled a follow-up appointment with a physician.  Dr. Fuentes, Bailey, and Scott all agreed that Little's condition on August 24, 2018 did not indicate he was having a medical emergency.  With four medical professionals concluding that Little did not have a medical

emergency on August 24, 2018, Little's contention that a lay person would have known he needed emergency medical attention runs counter to the evidence.  Moreover, even if Little did have a medical emergency and Knox incorrectly assessed him as not requiring emergency medical care, that would still not sufficiently support a deliberate indifference claim because such a claim requires more than negligent medical care. *Popoalii*, 512 F.3d at 499.  Little's deliberate indifference claim against Knox boils down to simply disagreeing with her medical assessment and the course of treatment provided to him, which does not constitute a constitutional violation.  See *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985) (finding that a disagreement with medical treatment does not constitute a constitutional violation); *see also Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (same).  Accordingly, the Court grants summary judgment as to the deliberate indifference claim against Knox.

**V.      Motion to appoint counsel**

Little filed a motion to appoint counsel after the motion for summary judgment had been fully briefed.  Doc. 41.  However, "there is no constitutional or statutory right to appointed counsel in civil cases.  Rather, when an indigent prisoner has pleaded a nonfrivolous cause of action, a court '*may*' appoint counsel."  *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006) (citations omitted) (emphasis in original).  When determining whether to appoint counsel for an indigent litigant, a court considers relevant factors such as "the factual complexity of the issues, the ability of the indigent person to investigate the facts, the existence of conflicting testimony, the ability of the indigent person to present the claims, and the complexity of the legal arguments."  *Phillips*, 437 F.3d at 794.

As an initial matter, the Court denied Little's previous motion to appoint counsel.  Doc. 29.  The Court found the case was not factually complex, Little had demonstrated he could

investigate the facts and present his claims with at least a basic understanding of the rules of civil procedure, no conflicting testimony had been presented to the Court, and the case did not involve complex legal arguments. *Id.*

Upon consideration of the factors for a second time at this later junction in the case, the Court again finds appointment of counsel unnecessary. First, Little had the ability to investigate the facts and demonstrated his ability to conduct discovery. By his own motion, he requested that the Court order Defendants to provide him with his medical records. Doc. 21. The Court granted that motion, Doc. 22, and the Defendants complied with that Order. Doc. 28. The Court has also not been presented with any conflicting testimony. Further, the Court finds that this case does not involve particularly complex legal issues. Little's claim turns on his medical condition and the treatment he received, which can be ascertained from medical records and Defendants without the assistance of counsel. Lastly, the Court issued an order instructing Little how to present his evidence and respond to Defendants' Statement of Uncontroverted Material Facts in compliance with Local Rule 4.01(E). Doc. 42. Little has not responded to that order. Accordingly, the Court denies Little's motion to appoint counsel.

So Ordered this 22nd day of February, 2021.

_____

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

22